## PECK *v.* YOUNG.

*Alienage* cannot be set up, in bar of a recovery in an action of ejectment, by
the daughter of a person, who became *a citizen of the United States* at the
time of the declaration of independence, although the parent was a na-
tive of Scotland, and the daughter was born there in 1769, married, and
remained there under coverture until 1825, and never came to this country
until 1830.

Whether the ability of the plaintiff to take and hold real estate here by *de-
scent,* is derived from the citizenship of the father, or is conferred by the
second clause of the fourth section of the act of Congress of 1802, estab-
lishing a uniform rule of *naturalization, quere.*

What constituted a European subject of Great Britain, domiciled here at
the time of the declaration of independence, a citizen of the United
States, considered.

ERROR from the Supreme Court. *Mary Young*
brought an action of *ejectment* against *Samuel Peck,*
in the superior court of the city of New-York, for the re-
covery of an undivided moiety of a house and lot in the
city of New-York, whereof her father, *James Knox,* died
seized, in 1823. James Knox was a Scotchman by birth,

1841.

Peck
*v.*
Young.

and came to this state in 1774, leaving his daughter, the plaintiff in this case, in the care of his father, her mother having previously died. He remained in this state until his death, having, in 1816, acquired the property in question by purchase. The plaintiff was born in Scotland in 1769, and was married there to *George Young*, probably previous to her coming of age, and lived with him until his death in 1825, and remained in Scotland until 1830, when she came to this state, and in 1834 commenced this suit. The defendant, *Peck*, was a tenant of the grand-children of James Knox, who are the children of a deceased son of his by a second marriage. It was admitted on the trial, that *James Knox* was *a citizen of the United States prior to the year* 1802, and so continued till his death; but in what manner or at what time he became such citizen was not shewn. There was no evidence whatever as to whether Knox took part with the country in the re-volutionary struggle, or adhered to the enemies of the state; the only proof bearing upon the subject was the evi-dence of a *British soldier*, who testified that he saw Knox in 1779 on Long Island, between Bedford and Jamaica, and that Knox at that time followed the occupation of a pedlar. The presiding judge charged the jury that at the time of the descent cast, Mary Young was an alien, and could not take any part of her father's estate. The coun-sel for the plaintiff excepted to the charge, and the jury found a verdict for the defendant on which judgment was entered. The *plaintiff* sued out a writ of error, and the supreme court *reversed* the judgment of the court below and directed a *venire de novo* to be issued. See the opin-ion delivered by the chief justice, 21 *Wendell* 390, *et seq.* Whereupon the *defendant* removed the record into this court, where the case was argued by:

*E. Paine and B. F. Butler*, for the plaintiff in error.

*J. Anthon*, for the defendant in error.

*Points submitted and argued on the part of the plaintiff in error:*

I. The defendant in error, on the facts given in evidence, was clearly an alien at the time of the death of her father, and as such, incapable of taking any part of his estate as heir, unless made a citizen of the United States, by the second clause of the fourth section of the act of congress of April 14th, 1802. *Laws of the U. S., Bioren & Duanes ed., vol.* 3, *p.* 478, § 4. 2 *Story's ed.* 850. 2 *Kent's Comm.* 50, 53. *Calvin's Case,* 7 *Coke's Rep.* 25. *Jackson* v. *Lunn,* 3 *Johns. Cas.* 109.

II. To bring a party claiming the benefit of the clause in question within the same, the facts required by it should be shown affirmatively by such claimant; and no intendment could be made on the argument of the writ of error in the supreme court, and none can be now made, to help out any defect in the proof of such facts. *Harwood* v. *Goodright, Cowp. R.* 92. *La Frombois* v. *Jackson,* 8 *Cowen* 600. *Powell* v. *Waters, Id.* 680.

III. It is conceded by the supreme court, that the clause in question was only intended to apply to the children of persons who were native born citizens, or who, by participating in the establishment of our independence, became *original* citizens, and such is undoubtedly its true construction; but the defendant in error did not prove either of these facts in respect to her father, James Knox.

1. It was proved and admitted that he was not a native born citizen.

2. Although it was proved that he left Scotland for America in 1774, and resided in New-York, or on Long Island, yet there was no proof whatever that he participated in the establishment of the independence of the United States, or adhered to the new government: on the contrary, as the city of New-York and Long Island were in the possession of the British troops from the 15th of September, 1776, to the 25th of November, 1783, the presumption is, that he adhered to Great Britain, and such is also the

effect of the evidence given by the defendant in error. *Inglis* v. *Sailors' Snug Harbor,* 3 *Peters S. C. R.* 99, 126, 179, 2 *Kent's Comm.* 41, 60. *Kilham* v. *Ward,* 2 *Mass. R.* 236. *Gardner* v. *Ward,* 2 *Mass. R.* 244, *n.* *McIlvaine* v. *Coxe's lessee,* 4 *Cranch R.* 214.

3. The admission "that James Knox was a citizen of the United States prior to the year 1802," does not imply that he was an *original* citizen. When taken in connection with the facts proved, the legal intendment is, that he had become a citizen under the laws of a state, or by being *naturalized* prior to 1802; consequently the first, and not the second clause of the fourth section of the act of 1802, was made for the defendant's case, could she bring herself within it. But she does not come within the first clause, because she was not a resident when her father was made a citizen.

4. On the facts proved, and independently of every other question in the case, the defendant in error wholly failed in the attempt to bring herself within the act of 1802; and the judge was therefore right in instructing the jury that she was an alien at the time of the descent cast.

IV. The defendant in error was not within the provision referred to, because neither parent was a citizen of the United States at the time of her birth. The intention of the act was to protect children born abroad, *after the existence of the United States,* and of parents who, *at the time of the birth of such children,* were American citizens. *Calvin's case,* 7 *Coke's R.* 17, 18, *b.* *Vattel, b.* 1, *ch.* 19, § 215, 212. *Puffendorf, b.* 7, *c.* 2, § 20. *Co. Lit.* 129, *a.* 2 *Chitty's Com. Law* 108, 114. 25 *Edw. III, stat.* 2. 7 *Anne, c.* 5. 10 *Anne, c.* 5. 4 *Geo. II, c.* 21. 1 *Black. Comm.* 373. *Doe* v. *Jones,* 4 *Term R.* 300. *Hargrave's notes to Coke Lit.* 8 *a,* note 1. *Act of Congress of March* 26, 1790, 2 *Bior. & Du.* 82. 1 *Story* 76. *Act of January* 28, 1795, 2 *Bior. & Du.* 436, § 3. 1 *Story* 380. *Act of April* 14, 1802, 3 *Bior. & Du.* 478, § 4. 2 *Story* 850.

*Jackson* v. *White,* 20 *Johns. R.* 324. 2 *Kent's Comm.* 50, 51.

V. The defendant in error was not within the provision referred to, because her *mother* never was a citizen, whereas the statute requires that *both* parents shall be or have been citizens. *Same cases as under last point.*

VI. The provision in question must be taken in connection with the political history of the United States, with the general rules of law in regard to aliens, with other acts of Congress in *pari materia,* and with the general policy of the United States as an independent government. When so considered, its true construction is, that it tenders to every person born abroad of parents who were either native born or original citizens of the United States, the right of citizenship, provided such person shall elect to avail himself thereof ; but it does not *per se* and independently of such election, impose upon him the burthens, or entitle him to the privileges, of an American citizen.

1. The great object of this provision and of all the other provisions of the acts of Congress on the subject of naturalization, was, to define the *political* condition of the persons referred to, and to determine what persons, though born out of the United States, shall be deemed citizens thereof. The question whether or not any particular class of persons shall be capable of taking land by descent, is left to be settled by the local laws and is only incidentally affected by the legislation of Congress.

2. All the provisions of the acts of Congress in regard to naturalization, imply, from their very nature, that the party who is to be included therein, elects to be considered an American citizen, and to avail himself of the political rights belonging to a citizen. *Vattel B.* 1. *ch* 19, §214. 1 *Kent's Comm.* 76, 79, 2 *id.* 40, 41, 47. *Kelly* v. *Harrison,* 2 *Johns. Cas.* 30. *Jackson* v. *White,* 20 *Johns. R.* 313, 324. *Kelham* v. *Ward,* 2 *Mass. R.* 236, *Campbell* v. *Gordon,* 6 *Cranch R.* 176. *Doe* v. *Acklam,* 2 *Barn. & Cress.* 779. *Inglis* v. *Sailors Snug Harbor,* 3 *Pet. R.* 99, 122, 160, and *cases*

1841.

Peck
*v.*
Young.

*there cited.* 3. Such election is to be evinced in the case of an adult born under a Foreign Government, by his becoming an actual resident of the United States, accompanied by a declaration of his intention to become a citizen. Minors so long as they are incapacitated from making an election for themselves, will, as a general rule, be considered as following the condition of their parents, subject to the right of disaffirmance, within a reasonable time after the termination of their minority; but under peculiar circumstances, minors who have arrived at years of discretion, will be deemed to have made their election before reaching the age of twenty one. *Acts of Congress from* 1790, *above cited.* *Also, Act of March* 26, 1804. 3 *Bior. & Du.* 614. 2 *Story* 942. *Act of March* 3, 1813, § 12. 4 *Bior. & Du.* 512. 2 *Story* 1304. *Act of July* 30, 1813, 4 *Bior. & Du.* 585, 2 *Story* 1354. *Act of March* 22, 1816, *Vol.* 6, 23, 3 *Story* 1539. *Act of May* 26, 1824, *Vol.* 7, 319, 3 *Story* 1973. 4. Whatever, therefore, may be the general words of any act of Congress on this subject, they must be construed with the implied qualification, that persons who elect to reside within, to adhere to, and to be subjects of a foreign state, are, so long as such adherence and subjection continue, not American citizens, but aliens. 1 *Black. Comm.* 60 *to* 62. 1 *Kent's Comm.* 462 *to* 466. 6 *Bacon's abridgment, Title Statute I, sections* 2, 3, 4, 5, *and cases there cited.* *Dwarris on Statutes, part* 2, *p.* 690, 692, 694, 700, 703, 724, *to* 728. *United States* v. *Fisher,* 2 *Cranch. R.* 386, 387.

VII. The defendant in error did not, at any time before the descent cast, elect to avail herself of the privilege tendered by the act of 1802, or evince any intention so to do; but on the contrary she elected to be, and continued to remain, until long after the descent cast, a British subject. 1. By the treaty of 1783, the defendant in error, being a native born subject of Great Britain, and being then over the age of twelve years, and residing under and adhering to the government of Great Britain, was left a British sub-

ject and fixed in that condition, notwithstanding her mino-
rity and the residence of her father in the United States.
1. *Black. Comm.* 368. *Kelham* v. *Ward,* 2 *Mass. R.* 236.
*Doe* v. *Acklam,* 2 *Barn. & Cress.* 779 *S. C.* 9 *Com. Law R.*
238. *Doe* v. *Mulcaster* 5 *Barn. & Cress.* 771. *S. C.* 12
*Com. Law R.* 374. *Shanks* v. *Dupont,* 3 *Peters'* 242, 247,
268. *Inglis* v. *Trustees of Sailors Snug Harbor,* 3 *Pe-
ters* 99. *Puffendorf, Lib.* 8, *chap.* 11, § 9. 2. The defend-
ant in error resided continually in Great Britain until after
the death of her father. 3. Her marriage to a British
subject was no disability in law to excuse the non-claim
of political rights in the United States, but on the contrary
confirmed her character as a British subject. *Kelly* v. *Har-
rison,* 2 *Johns. Cas.* 30. *Shanks* v. *Dupont,* 3 *Peters'* 242.

*Points submitted and argued for defendant in error:*

I. James Knox, the father of Mary Young, the defend-
ant in error, having arrived in this country in 1774, and
having continued a resident until his decease, in 1823, is to
be considered a natural born citizen. *Gardner* v. *Ward,* 2
*Mass.* 226. *Dawson's Lessee* v. *Godfrey,* 4 *Cr.* 321.
*Blight's Lessee* v. *Rochester,* 7 *Wheat.* 535. *Cunningham*
v. *Springfield,* 2 *Pick.* 394. *Inglis* v. *Trustees S. Snug
Harbor.* 3 *Pet.* 126. 3 *Story on the constit.* 571. *Doe v.
Arden,* 2 *Barn. & Cress.* 779. *Hebron* v. *Colchester,* 5
*Day,* 169. *Const. N. Y.* § 35. 1 *Burge. Col. Law,* 724.

II. The defendant in error, at the time of the declara-
tion of independence, being an infant, was bound by the
election of her father, and became also a citizen, independ-
ent of any positive statute. Same cases. 2 *Kent's Comm.*
33. *Bacon* v. *Bacon, Cro. Car.* 602.

III. If she possessed the right of electing when she at-
tained the age of twenty-one, she did not then possess the
power, being *sub potestate viri.* *Id.*

IV. At the time of the death of her father, in 1823, she
was still covert, and therefore, under the operation of her

father's election, which made her at the time of descent cast a citizen, and possessed of inheritable blood. *Id.*

V. When she became discovert, upon the death of her husband, in 1826, she immediately exercised her election, and confirmed the acts of her father, thus becoming a citizen *ab initio*. *Id.*

VI. Independent of these conclusions of common law, she became a citizen, and capable of inheriting, by the act of Congress of 14 April, 1802. *Campbell* v. *Gordon*, 6 *Cranch*, 176. *Davis* v. *Hall*, 1 *Nott & McCord*, 292. 2 *Kent's Comm.* 44. *Charles* v. *Munson and Brinfield Manufacturing Company*, 17 *Pick.* 70. *Manchester* v. *Boston*, 16 *Mass.* 230. 1 *R.* 3, *p.* 7, *Hussey*, *C. J.* 2 *Kent*, 43. 25 *Ed.* 3, *c.* 2. 29 *Car.* 2, *c.* 6. 7 *Anne*, *c.* 5. 4 *Geo.* 2, *c.* 21. 13 *Geo.* 3, *c.* 2. *Act Con.* 1790, 2 *Bior.* 82. 1795, *id.* 1798, 3, *id.* 61. 1802, *id.* 475. 1804, *id.* 614.

VII. This statute expressly confers the benefit of citizenship on the children of the citizen, without requiring any act of residence or election, and gives them inheritable blood wherever they may reside.

VIII. The only qualification, or restriction, contained in the statute, relates to the descent of such rights to the issue of such children, such descent being prohibited unless the father has *resided* in the United States.

IX. If, contrary to the plain terms of the act the defendant in error was bound to elect, she has done so within a reasonable time after she possessed the power.

After advisement the following opinions were delivered:

By the CHANCELLOR. This case turns upon the capacity of Mary Young, to inherit lands from her father in this state, which he purchased in 1816, and owned at the time of his death, in 1823. James Knox, the father, was a native of Scotland, and emigrated to this country in 1774, leaving his daughter Mary, then an infant two or three years of age, under the care of her paternal grandfather.

She subsequently married in Scotland, and continued there 1841. until after the death of her husband, in 1826, and then came to this country with her daughter, and claimed part of her father's estate by descent.

Peck
v.
Young.

The evidence in the case satisfactorily establishes the fact, that her father became a citizen of the United States, or rather of the state of New-York, upon the disruption of the ties of allegiance, by which the people of this country were originally bound to the British crown. As to those who were born before that time, it is immaterial whether they were born in this country, or in any other part of the British dominions; for upon the separation of this country from the crown of Great Britain, in 1776, every British born subject who was domiciled in the United States, and who did not continue to adhere to the former government, and elect at the termination of our revolutionary struggle to continue his allegiance to that government, and to retire from this country, became a citizen of the new government within the bounds of which he was thus domiciled at the declaration of our independence. We date the severance of the ties of allegiance from the 4th of July, 1776, while in England, the separation of the two countries is not considered to have taken place until the treaty of peace in 1783; so that there may be cases of children born in the United States between those two periods, whose parents were not domiciled in either country at the termination of the contest, who have never made any election on the subject of their allegiance, who may be entitled to inherit lands, or to transmit them by descent, in both countries.

In this case, however, James Knox was residing here at the time of the declaration of independence, and continued to reside here until his death, nearly fifty years afterwards; and as there is no evidence that he ever adhered to the enemies of this country, during any part of the revolutionary struggle, he must be considered a citizen of this state from the time of the declaration of independence, in the same manner as if he had been born here. The question then

arises, whether his infant daughter, who had been left by him in Scotland, in 1774, and who was still an infant not only at the time he became a citizen of this state, but also at the time of the treaty of peace, in 1783, is entitled to the rights of citizenship here, either by this transfer of the allegiance of her father, or by virtue of the 4th section of the naturalization act of April, 1802.

The learned chief justice, who delivered the opinion of the supreme court, has put his decision in her favor, upon the latter ground. That section provides that " the children of persons duly naturalized under any laws of the United States, or who, previous to the passage of any law on that subject by the government of the United States, may have become citizens of any one of the states, under the laws thereof, being under the age of twenty-one years at the time of their parents being so naturalized or admitted to the rights of citizenship, shall, if dwelling in the United States, be considered a citizen of the United States; and the children of persons who now are, or have been citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens of the United States; provided that the right of citizenship shall not descend to persons whose fathers have never resided within the United States," 2 *Story's Laws U. S.* 852. I cannot believe it was the intention of Congress to extend the second clause of this section to all children of any person who then was, or ever had been a citizen of the United States, without reference to the time of the birth of such children, or the country to which the parent owed allegiance at the time of such birth. Such a construction appears to be inconsistent with the previous clause of the same section. It would also give the rights of citizenship to all the refugees who left the country at the treaty of peace, 1783; provided their parents remained in this country, and became citizens thereof. The previous clause had in terms restricted the naturalization of children by the naturalization of the parents, to such children as

were at the time of the passing of that act, dwelling in the United States, and who were under age at the time of the naturalization of the parent; and if the second clause is limited to children born out of the United States, whose parents were citizens of the United States *at the time of such birth*, it is perfectly consistent with the restriction in the previous clause. But the construction adopted by the supreme court, would give to every child of a foreigner who had been naturalized here previous to April, 1802, the rights of citizenship, although such child was an adult at the time its father was naturalized, and had never been in the United States. I think the object of the second clause of the section, was to change the common law rule, that the child of a citizen if born in a foreign country, was an alien.

· The original act of March, 1790, 1 *Story's Laws, U. S.* 76, contained the following provision on the same subject: " And the children of citizens of the United States that may be born beyond sea, or out of the limits of the United States, shall be considered as natural born citizens." This act also contained the same proviso, that this right of citizenship should not descend to persons whose fathers had never been residents of the United States. In other words, if a citizen of the United States should have a son born in a foreign country, such son should be considered a citizen of the United States, notwithstanding his foreign birth. But if such son continued to reside abroad, his children should not have this privilege of citizenship, although their father was entitled to the rights of citizenship, under this clause of the statute, at the time of the birth of his children.

The third section of the act of January, 1795, which was substituted for the law of 1790, contained the following provision on the subject: " The children of persons duly naturalized, dwelling within the United States, and being under the age of twenty-one years at the time of such naturalization, and the children of citizens of the United

States born out of the limits and jurisdiction of the United States, shall be considered as citizens of the United States," with a similar restriction, that the right should not descend to persons whose fathers had never been residents of the United States. These two statutes clearly intended to embrace but two classes of cases; *First*—the children of aliens, who were under age and residing in the United States at the time of the naturalization of their parents; and, *Second*—children born out of the United States, whose parents, or fathers, were citizens of the United States at the time of such birth; and the act of 1802 was altered so as to embrace not only the children of parents who were then citizens, who might be born out of the United States, but also all children, born out of the United States, whose parents were citizens at the time of the birth of such children, although such parents were then dead; so as to make the statute retro-active in this respect. 16 *Mass. Rep.* 235. The transposition of the language of the first clause in the substituted act of 1802, has been held also to embrace the children of naturalized persons, who were in their infancy at the naturalization of the parent, if residing in the United States at the time of the passage of that act, although they were not here at the time of such naturalization of their parents. *Campbell* v. *Gordon and wife,* 6 *Cranch Rep.* 177. The case referred to on the argument, of *Charles* v. *Munson and Brinfield Manufacturing Company,* 17 *Pick. Rep.* 70, is not an authority for the construction given to the fourth section of the act of 1802, by the supreme court; for by examining that case it will be seen that the father of Miranda Charles was a citizen of the United States, when he removed to Montreal in 1790, and afterwards at the time of her birth.

I think, however, upon the other ground, the daughter of Knox is entitled to claim the privilege of a citizen of the United States. I consider it established by the proofs, that the father was domiciled here both at the time of our declaration of independence, and at the treaty of peace in

1783; and his daughter then being an infant, and not emancipated by marriage, her legal domicil followed that of her father and natural guardian, although he left her with his father at Paisley. It does not distinctly appear when the mother died. I infer, however, from the testimony, that she was probably dead at the time the father came to this country in 1774. But if she was living, the domicil of the husband was her domicil during the marriage, even if she had not actually left her domicil of origin, unless there was an intention to separate permanently from him; and the domicil of the father is the domicil of his child during its infancy and before emancipation. The father being domiciled in this country, therefore, she became a citizen of this state by the disruption of the ties of allegiance of herself and her father to the crown of Great Britain; and if she had come here when she became of age, and capable of acting for herself, even after the peace of 1783, I think no one can reasonably doubt that she could not have re-transferred her allegiance by marrying a British subject and going to Scotland to reside; and if she was an American citizen and legally domiciled here with her father, although actually left by him in Scotland for nurture, the fact of her marrying in that country after her rights as an American citizen had become complete at the close of the war, would not deprive her of the capacity to take lands by descent here; although from the time of her marriage there, her domicil became that of her husband, and continued such until she changed it again after his death. The marriage of a daughter, even under age, is an immediate emancipation from the control of her father, and by such marriage she has the power of changing her domicil to that of her husband, which she could not otherwise have changed by her own election during her minority; but as she was not of a proper age to contract matrimony until after her *status* in respect to her allegiance to this country was fixed by the close of the revolution, her marriage, which must have taken place subsequent to that

1841.

Peck
*v.*
Young.

event, could not deprive her of the right to inherit lands here.

I must, therefore, say that the charge of the judge of the superior court, that Mary Young was an alien at the time of the death of her father, and could not take any part of his estate by descent was erroneous, and I shall accordingly vote for an affirmance of the judgment of the supreme court, reversing that decision, and awarding a *venire de novo;* though for a different reason than that given by the learned chief justice.

*Senator* ELY remarked, that in his judgment, the act of congress of 1802, does not reach the case under consideration. The first clause of the act embraces only children who were under twenty-one years of age, and dwelt in the United States at the time of the naturalization of their parent; and the second clause provides only for that class of children, who might be born after the passage of the act, " of persons who now are or have been citizens of the United States." *Mary Young* was born without the United States, long before the passage of this act, and therefore does not come within the last clause of the above section; and there is no pretence that she comes within the first clause. She is, therefore, an alien, and not entitled to inherit.

By *Senator* SCOTT. The sole question in this case is, whether Mary Young, the defendant in error, is a citizen of the United States ? Her father, James Knox, a native of Scotland, arrived in New-York in 1774, and continued here until his decease in 1823. The defendant was born in Scotland in Nov. 1769, and was a resident there; she was married in 1789 while an infant; her husband died in 1827 or 8—she arrived in the United States about 1831, and has continued to reside here ever since.

James Knox was an inhabitant of the colony of New-York in 1774, when the first congress " Resolved, That

our ancestors, who first settled these colonies, and were, at the time of their emigration from the mother country, entitled to all the rights, liberties, and immunities, of free and natural born subjects within the realm of England, and that by such emigration, they by no means forfeited, surrendered or lost any of those rights, but they were, and their *descendants* now are, entitled to the exercise and enjoyment of all such of them as the local and other circumstances entitled them to exercise and enjoy." *Marshall's American Colonies.*

James Knox was a resident of the colony of New-York at the time our independence was declared, and as a natural born British subject, he was placed on an equal footing with all British subjects, inhabitants of the colony at that time. Uniting in the act of *separation* together with a residence under the new government was all that could be required; he was an original citizen, whose political birth commenced with the national birth. It was not necessary that he should have taken an active part in favor of the revolution by fighting their battles, or by participating in their councils. There is no evidence that he took side with the enemy, nor can this inference be drawn because he resided within the lines on Long Island; he was in the presence of, and surrounded by a powerful hostile army; in not adhering to the king at that time, when he could have done so with safety to himself and his family, shows he was favorable to our independence. It was enacted by the statute of 7 *Anne ch.* 5, *and* 4 *Geo.* II. *ch.* 21, *and* 13 *Geo.* III. *ch.* 21, that all children born out of the king's allegiance whose *fathers* (or grand-fathers by the fathers' side) were natural born subjects, should be deemed to be natural born subjects themselves to all intents and purposes; 1 *Blackstone* 373. These statutes shew what were the rights of Englishmen, which the colonists resolved that they, and their *descendants* were entitled to exercise. The act of congress of 1790, declared " that the children of citizens that may be born beyond sea, or out of the li-

mits of the United States, shall be considered as natural born citizens; provided the right of citizenship shall not descend to persons whose *fathers* have never been residents in the United States. The act, passed April 14th, 1802, § 4, provides that children of persons duly naturalized, under any of the laws of the United States, or who, previous to passing of any law on that subject by the government of the United States, may become citizens of any one of the said states under the laws thereof, being under the age of twenty-one years at the time of their parents being so naturalized, or admitted to the rights of citizenship, shall, if dwelling in the United States, be considered as citizens of the United States; and the children of persons who now are, or have been citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered citizens of the United States.

The first clause of this statute provides for two cases; the children of persons *naturalized*, or *specially admitted* citizens of any one of the states, before any act of congress passed on this subject. This appears to apply to persons previously naturalized, as well as to those *thereafter* to be naturalized, and is prospective. The second clause applies only to children of persons who *then were* or *had been* citizens, without restricting the children to *age* or *residence*, and evidently was intended to provide for the children of those persons who were natural born or original citizens. This clause is not prospective in its operation. The proviso, "the right of citizenship shall not descend to persons whose *fathers* have never resided within the United States," shews that the residence of the *mother* is not required. In this case the mother died before the father emigrated to America, and when the United States had no existence. The object of the act of congress, by declaring the children of citizens born abroad to be citizens of the United States, it appears to me was, to perpetuate the same policy some European governments, and particularly the British government had

adopted, with respect to the children of her natural born subjects, viz: that the condition of the child should follow that of the parent.

It is urged the intention of the act is to protect only those children born abroad, whose parents *at the time of their birth*, were American citizens. This construction is not borne out by the language of the act; the children of persons that now are, or have been citizens of the United states, "shall be considered to be citizens of the United States."

The defendant in error became a citizen at the same time her father did, by the retro-active operation of the statute, and was not, therefore, an alien at the time of the descent cast; she has now become a resident of this state, and having inheritable blood, she is entitled to a child's portion of the estate of which her father died siezed. I am therefore of the opinion, that the judgment of the supreme court should be affirmed.

On the question being put, *Shall this judgment be reversed?* the members of the court divided as follows:

*In the affirmative:* Senators DIXON, ELY, FURMAN, HOPKINS, H. A. LIVINGSTON, RHOADES and ROOT—7.

*In the negative:* the PRESIDENT of the senate, the CHANCELLOR and *Senators* DENNISTON, HULL, HUMPHREY, HUNT, HUNTER, LEE, NICHOLAS, PECK, PLATT, SCOTT, STRONG, and WORKS—14.

Whereupon the judgment of the supreme court was AFFIRMED.