The opinion of the Court was delivered by
Wardlaw, Ch.
The first and third of the appellant’s propositions, denominated grounds of appeal, are not entitled to the name as they do not serve the office of grounds of appeal. They are vague imputations on the decree, and do not point the attention of the Court to any specific error therein. It seems, however, they were not intended to embrace any matter additional to that in the second ground, except to dispute *44 the Chancellor’s conclusion, that words of release of a debt in a will not sealed, attested, admitted to probate, nor fully signed, do not constitute a releáse. This point is quite clear, and we are content to leave it on the Chancellor’s reasoning.
The second ground of appeal affirms that Augustus Saspor-tas and Zelmire Peraire are aliens. They were born without the limits of the United States, and of course aliens by the common law, 1 Bl. 372, 2 Kent 4, but they claim to be citizens, because, at the time of their birth, their parents were citizens, and they found their claim on the fourth section of the Act of Congress, concerning naturalization. 2 Sto. Laws U. S. 852, Dunlop 303. That section provides that “the children of persons duly naturalized under any laws of the United States, or who, previous to the passage of any law on that subject by the government of the United States, may have become citizens of any one of the States under the laws thereof, being under the age of twenty-one years at the time of their parents being so naturalized or admitted to the rights of citizenship, shall, if dwelling in fhe United States, be considered citizens of the United States, and the children of persons who now are or have been citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens of the United States; provided, that the right of citizenship shall not descend to persons whose fathers have never resided within the United States.” Various questions, involving the construction of the second clause of this section and its application under the circumstances of the case have been discussed by the counsel of the parties.
The mother of Augustus Sasportas and his sister, acquired the real estate in controversy after the death of her husband, and claiming through her they insist that as she was a native citizen and was resident here at the date of the passage of the Act of 1802, their citizenship is adequately saved through her alone, notwithstanding their foreign birth. My own impression is against this view, from the maxim of the common law on this subject proles sequiter sontem paternam, from the *45 inference from the terms of the proviso to the section concerning the residence of the father, and from the course of litigation hitherto under our Acts of naturalization and the Statute, 25 Edward HI, raising the question whether or not the citizenship of the father, never of the mother, was sufficient; but there is no authoritative decision upon the point, and the Court reserves it from judgment. I may say,'in passing, that, notwithstanding the doubt expressed in Dupont vs. Pepper, Harp. Eq. 15, as to this Statute of Edward the Third being of force in this State, I agree with Judges Grimke and Cooper that it was adopted by our Act of 1712. Grimke’s D. and App. 5, 2 Sta. 549. In the case just cited, the Court arguendo expressed the opinion that the citizenship of the mother was sufficient, but the decision of the case was overruled in the Supreme Court of U. S., 3 Pet. 252, there reported as Shanks vs. Dupont; not, however, for the error of this opinion, but on the ground that the mother was a British subject and entitled to the protection of her title to laud here by virtue of the 9th Section of the treaty of 1794; and in Davis vs. Hull, 1 N. and McC. 292, the opinion was expressed that the citizenship of the mother, where the father was an alien, would not save the citizenship of children born abroad. Nothing is concluded by us on this point.
It is urged in behalf of appellant that the saving of citizenship, in the clause in question, to children of foreign birth, does not apply to children of persons made citizens by naturalization, and is confined to children of native citizens. This argument has some support from a suggestion of Chancellor Kent in his 35th lecture, 2 Kent 53, from the opinion of C. J. Nelson in the Supreme Court of New York in Peck vs. Young 21 Wendell 390, and from the opinion of Senator Scott in the same case before the Court of Errors of N. Y., 26 Wend. 613, 626, but is greatly discredited by the reasoning of Chancellor Walworth, who delivered the leading opinion in the same case before the Court of Errors, 26 Wend. 622. I borrow from him much of my subsequent argument The first clause *46 of the section under consideration, applicable to children under age and resident in the United States at the time of the naturalization of their parents, has been treated as prospective and as including the cases of children of parents naturalized after the passage of the Act, and of children who became residents here after the naturalization of their parents, and who were infants at the time of such naturalization. Campbell vs. Gordon, 6 Cranch 177; 8 Paige 433. The second clause of the section is clearly confined to children of parents who before the passage of the Act had been citizens, or at the date of the Act were citizens, and it has been held to include retroactively the case of children whose parents were dead at the time the Act was passed. 16 Mass. R. 235. According to our construction, the two clauses of the section were intended to provide for two classes of children, the first of infant and resident children at the time of the naturalization of the parents, where the parents were aliens at the birth of the children; and the second of children bom out of the United States, when at the time of their birth their parents were citizens, whether before or at the time of the passage of the Act. To interpret this second clause as including all children of citizens, without discrimination as to the age of the children when the parties became citizens', and as to the allegiance of the parents when the children were born, would hardly be consistent with the careful provisions of the first clause of the section concerning the infancy and residence here of the children acquiring citizenship through the naturalization of their parents, and might confer citizenship upon adults who fought against our independence throughout the revolutionary war and left the country when our independence had been acknowledged by the treaty of peace in 1783; if their parents abided here and became citizens before 1802, this could not have been the purpose of Congress. But if we limit the remedial provision for children of foreign birth to the case of children born abroad while their parents were citizens, no inconsistency between the first and second clause and no impolitic conse *47 quence as to refugees can follow. The Act of March, 1790? 1 Story Laws U. S. 76, which was the first law passed by the government of the United States concerning naturalization, provided that “the children of citizens of the United States that may be bom'beyond sea or- out of the limits of the United States, shall be considered as natural born citizens ;” and the Act of January, 1795, which superseded the former Act, provided that “the children of citizens of the United States born out of the limits and jurisdiction of the United States shall be considered as citizens of the United' States;” and then the Act of 1802, which has been quoted, provided for children of foreign birth, but restricted relief to the children of parents who were citizens at the date of the Act, or had been citizens previously. All of these three- Acts contain the proviso that the right of citizenship shall not descend to children whose fathers have never resided in the United States. Thus a child of a citizen might derive citizenship from his father; yet, if he never resided here, he could not transmit the right to his children. The supposed defect of the Act of 1802, was in the omission to provide for children of foreign birth of parents who became citizens by birth or naturalization after April, 1802, and this defect was supplied by the Act of February 10, 1855, which enacted in the first section that “persons heretofore born, or hereafter to be born, out of the limits and jurisdiction of the United States, whose fathers were or shall be, at the time of their birth, citizens of the United States, shall be deemed and considered and are hereby declared to be citizens of the United States; provided, however, that the rights of citizenship shall not descend to persons whose fathers never resided in the United States; and in the second section enacted, that “any woman, who might lawfully be naturalized under the existing laws, married or who shall be married to a citizen of the United States, shall be deemed and taken to be a citizen.” All of these Acts being in pari materia should be construed together, so as to form a symmetrical and rational system, wherever their provisions are consistent. Richards vs. Mc *48 Daniel, 2 Mill C. R.; Darour vs. Jones, 4 Term R. 309; Burnett vs. Bull, 10 Rich. L. The Act of 1855 is to a great extent merely declaratory, dispelling doubts as to the intention of the legislature in previous enactments, and in no proper sense ousting vested rights. Waving this principle of-construing the Acts on this subject as a system, and looking to the meaning of the clause in question of the Act of 1802, segregated from precedent and subsequent enactments, there is no sound principle which would justify us to interpret the phrase “ citizens of the United States” as confined to citizens by birth within the United States, in exclusion of naturalized citizens. Statutes conferring rights and privileges are to be construed liberally in behalf of the recipients, infavorem libertatis. We must consider, too, that the words are employed in an Act intended to prescribe a uniform mode of transforming aliens to citizens, and where the terms of enactment should be naturally and primarily referred to naturalized citizens, unless the intent to exclude them be expressed or easily implied from the context or be palpably manifested by the policy of the government as declared in its legislative Acts. The exclusion of naturalized citizens is not express, nor arising from strong implication, nor against any declared policy by Congress, unless we pervert the phrase children of citizens, naturally meaning children born while their parents were citizens, into all children of aliens who may become citizens. We are of opinion that if Abram Sasportas were a citizen at the time of the birth of his children, the accident of the children being born in Prance does not make the children aliens, or in other words obstruct their citizenship here.
The appellant contests the citizenship of Abram Sas-portas. The facts are, that Abram Sasportas was of foreign birth; that he was married in Charleston, on or before September 16th, 1778; for, on that day, he executed a release and conveyance of his wife’s portion; that he fought in some of the battles of the Revolution as a Whig officer; that on October 1, 1785, he received conveyance of real estate, and fre *49 quently afterwards acquired and conveyed real estate ; that he was reputed by some who knew him as early as 1778, to be then a citizen, and was alwaj^s reputed to be a citizen by the oldest persons who could be brought to testify on the point, that he was domiciled here, and exercised the privileges of a citizen from the earliest date to which his history could be traced; that he went to France about 1804, in prosecution of the commerce in which he was engaged, and while there, in 1812, executed a power of attorney to Rene Godard, of this city, in which he styled himself a citizen of the State; that at the close of our last war with Great Britain, he resumed his residence in Charleston, and abided here for about four years with his wife and children — Augustus and Zelmire, as members of his household ; that he returned to France in 1819, with the purpose of having some surgical operation performed on his eyes, and died there in 1823; that his children, although born in France, during his residence, beginning in 1804, always claimed to be citizens of the United States; and that his son, Augustus, had obtained a passport in the character of citizen.
In this state of facts we might presume, without much straining, that Abram Sasportas was resident here on July 4, 1776 ; and, presuming that fact, he would clearly be an original citizen, on the same standing with natives of the territory. Chanet vs. Villeponteux, 3 McC. 29; 1 St. 152. But we are disinclined to doubtful presumptions, and prefer to treat the case as if he had become resident here in 1778, from which time his biography is narrated by the evidence.
It is not supposed that he was ever naturalized under any Act of the United States, and if he were a citizen in 1S02, he must have attained this character under the laws of South Carolina, before Congress, in 1790, exercised its constitutional power of precribing a uniform procedure concerning the subject of naturalization. We must then review the legislation of South Carolina in relation to the admission of aliens’ to citizenship.
*50 The Act of 1696, 2 St. 131, provided that all aliens, male and female, who were inhabitants of the province at the date of the Act, with their wives and children, should enjoy all the rights and privileges of persons born of English parents; adult persons being required to take an oath of allegiance to King William. The Act of 1704, 2 St. 251, provided that aliens then in the province, who had not put themselves within the proviso of the Act of 1696, and all aliens who should thereafter come into the province, should be entitled to all the rights and privileges of persons born here of English parents; exacting, however, oaths of allegiance, and abjuration from persons of the age of sixteen, at the passage of the Act. No oath is expressly required from aliens, not of the age of sixteen, in 1704, who should thereafter come into the province. This was the Act on the subject of force, when the residence of Abram Sasportas in September, 1778, was certainly established to be within the limits of the State. In March, 1778, 1st St. 147, however, the State prescribed an oath of allegiance to be taken by all adults from whom it might be required. In 1784, 4 St. 600, the Legislature enacted that all free white persons then resident in the State, and all such as should thereafter reside therein for one year, should become citizens on taking the oath prescribed by the Act of 1778, before one of the judges of the Common Pleas, who was required to give a certificate thereof. On March 22, 1786, 4 St. 746, the Legislature formally repealed the Acts of 1704 and 1784, but re-enacted, almost in terms, the provisions of the latter Act, yet disabled aliens from voting for members of the Legislature, serving on ordinary juries, and filling certain offices, with an express prbviso, that the enactment should not deprive resident persons of rights already acquired under the Acts of 1704 and 1784, or susceptible of acquisition, if the Acts had remained of force. On February 27, 1788, 5 St. 66, an Act was passed requiring the Secretary of State to keep a book in his office for registration of the certificates granted by the judges of the Common Pleas, and himself to give a cer *51 tificate of the registry; and further providing that all persons intending to avail themselves of the rights granted by the previous Acts, and who had taken the oath of allegiance, should be obliged, when required, to produce certificates from the Secretary; and in case of their refusal or neglect, for a prescribed time, that the privilege demanded by them should not be admitted. I suppose this provision for production of a certifii cate from the Secretary, to be strictly personal to one of foreign birth, offering to exercise a particular privilege, such as voting, and not intended to affect his citizenship, or the claims of his children. However this may be, the citizenship of Abram Sasportas depends on the construction of the Act of 1704, interpreted in the light of other enactments, in pari materia. That Act, in itself, required no oath from him, and consequently no record of such oath; but, granting that from the general course of legislation on this subject an oath of allegiance was exacted from him, and required to be recorded, we must consider whether or not his compliance with the law may be presumed, from the great lapse of time, after his exercise of the privileges of a citizen, and his reputation to be a citizen. The efficacy of this presumption, that the the exercise of a right for a long term is rightful, and that exact evidence of it is lost, is'not disputed, but it is said, that proof of a matter required to be in record cannot be made by parol. In Rex. vs. Hube, Peake’s A. P. C, 132, on an indictment for disturbing the public worship of Protestant Dissenters, authorized by the Toleration Act, Lord Kenyon held, that it was incompetent for the minister to prove orally that he had taken prescribed oaths, as the oaths might be proved by record, but he further held, that it was unnecessary to prove the taking of the oaths; so that, at most, his opinion was a mere dictum. Granting that his opinion is sound doctrine, it has no application to presumption from lapse of time. The interests of mankind require us to presume, that the long enjoyment of á claim is rightful, and in protection of such claim, that a grant of land from the State, or of administration from the *52 Ordinary, or of any muniment of title, once existed', and if not produced, that it has been lost by devouring time. In Smith vs. Smith, Rice, 232, and McQueen vs. Fletcher, 4 Rich. Eq. 152, records were presumed on evidence not stronger than exists in this case. We conclude that Abram Sasportas had complied with all the pre-requisites to citizenshipd>y the law of this State before 1790, when the Congress of United States began to exercise its power on this subject, and of course, that he was a citizen in 1802, within the proviso of the Act then passed.
It is ordered that the appeal be dismissed, and the decree affirmed.
Dunkin and Dargan CC., concurred.
■ FLppeal Dismissed.