## Walter Crane v. Edwin Reeder and another.

*Citizenship: Aliens: Jay's treaty.* A British subject who resided at Detroit before, and at the time of, the evacuation of the territory of Michigan under the provisions of Jay's treaty, and who continued to reside there afterwards, without, at any time prior to June 1, 1797, declaring his intention to remain a British subject, became, *ipso facto,* for all purposes, an American citizen.

*Act of Congress construed: Aliens: Minor children: Citizenship.* Under that clause of the fourth section of the act of Congress of April 14, 1802 (*2 U. S. Stat. at Large, p. 155,* § *4*), providing, that "the children of persons duly naturalized under any of the laws of the United States, etc., being under the age of twenty-one years at the time of their parents' being so naturalized, etc., shall, if dwelling in the United States, be considered as citizens of the United States," the minor child of one who became a citizen under Jay's treaty, if residing in the United States at the time, would thereby become a citizen; a treaty is just as much a "law of the United States," within the meaning of this provision, as an act of Congress.

The second clause of said section, providing, that "the children of persons who now are, or have been, citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens

CRANE *v.* REEDER.

of the United States," does not apply to those whose parents at the time of their birth were aliens.

This clause, however, is not restricted to the cases only of the children of natural born citizens, and citizens who were original actors in our Revolution; but embraces also the case of children of naturalized citizens.

*Ejectment: Escheats: Fraud: Evidence.* In an action of ejectment, where the plaintiff claims under a deed from the State Board of Escheats, evidence is not admissible, on behalf of defendants claiming adversely thereto, to show that, in the sale and conveyance by such board to the plaintiff, a fraud was committed upon the state; an adverse claimant cannot raise a question of fraud in a conveyance to which he is a stranger; the party injured by a fraud alone can complain of it

*Finding of jury construed.* The error committed by the admission of such evidence, is not cured or rendered immaterial by the fact that the jury, in answer to the question, "Were said sale and conveyance fraudulent in fact?" say, that they cannot answer; this finding is not against fraud, but is equivalent to a verdict of "not proven," simply; and being expressed in this guarded manner, it carries upon its face the proof, that the testimony put in upon this point, had some influence upon the minds of the jury.

*Ejectment: State tax-deed: Evidence.* In an action of ejectment an objection to the introduction in evidence of a state tax-deed to the defendants, that assumes facts to be established which constitute matter of defense to the deed, but which might be disputed, is untenable.

*Statute construed: Instruction to jury: Special questions to jury.* An instruction to the jury in reference to special questions proposed to them under the statute (*Sess. L. 1871, Vol. 1, p. 66*), that they were not obliged to answer them absolutely, and that if they were of opinion there was no evidence sufficient to satisfy their minds in one way or the other in regard to any particular question they might so state in answer to any specific question, is erroneous. No question should be put to the jury which is not material to the inquiry; and upon every material question one party or the other holds the affirmative, and if he fails to make out his case upon it by the evidence, the finding should be against him upon it.

*Form of questions to jury.* Under an issue to which the question, whether Maria Yorke Harvey died without heirs who were citizens of the United States, is material, the question, "Are you satisfied that Maria Yorke Harvey died without heirs, etc.," is not admissible, because it is unfair to the party against whose showing it is directed. The question in this form calls for a greater degree of certainty in proof than is required under the general course of common-law trials.

*Response of jury to specific questions.* The findings actually made, in response to specific questions, do not cure the errors committed on the trial, where some proper questions are not answered at all, and some that are answered, are in such form that the responses are in law no findings at all, and cannot be made the basis for any conclusion. To the extent that relevant questions properly put to the jury remain unanswered, there is a mistrial.

*Escheated lands: Waiver: Estoppel: State tax-deed.* The state does not waive its right to insist upon an escheat, or estop itself from afterwards claiming lands as escheated lands, by causing the same to be assessed for taxation to one who occupied them, and taking proceedings to enforce payment of the taxes by selling the lands for delinquent taxes.

*Heard May 17. Decided July 10.*

Error to Wayne Circuit.

*Samuel T. Douglass, William P. Wells,* and *George E. Hand,* for plaintiff in error.

*D. B. & H. M. Duffield, Henry M. Cheever,* and *Theodore Romeyn,* for defendants in error.

COOLEY, J.

The plaintiff in this case claims the lands in controversy, under a purchase of the same from the state of Michigan, as lands which had escheated to the territory of Michigan by reason either of the alienage of John Harvey, the patentee of the lands, or, if he was a citizen, then by reason of his death or the death of his only child, Maria Yorke Harvey, without heirs at law. The lands lie in the vicinity of Detroit. Harvey's patent bore date in 1811, but it was issued to give complete effect to the confirmation to him of a claim which he had purchased from a prior occupant in 1801, and which was confirmed by the Land Board in 1807. It is conceded that John Harvey was an Englishman by birth, but the period of his emigration to this country was in dispute. The defendants claimed that he was resident at Detroit on the 19th day of November, 1794; the plaintiff denied this, and claimed to have shown by evidence, that he came to this country several years later. The time was important, inasmuch as it was insisted on behalf of the defense, that John Harvey, being a resident of Detroit before and at the time of the evacuation of the territory of Michigan under the provisions of Jay's treaty, and continuing to reside there afterwards for many years, without having declared his intention to remain a British subject, thereby became a citizen of the United States, by force of the provisions of that treaty.

The disputed question of fact, whether John Harvey resided in the territory of Michigan as early as the defend-

ants claimed, was determined by the jury in the affirmative; and assuming this to be established, and that he continued to reside there afterwards, without at any time prior to June 1, 1797, declaring his intention to remain a British subject, we have no doubt he became, *ipso facto*, for all purposes, an American citizen. The second article of Jay's treaty of 1794, provided that his Britannic Majesty should withdraw all his troops and garrisons, from all posts and places within the boundary lines assigned by the treaty of peace to the United States, on or before the first day of June, 1796; that all settlers and traders within the precincts or jurisdiction of the said posts, should continue to enjoy, unmolested, all their property of every kind, and be protected therein; that they should be at full liberty to remain there, or to remove with all or any part of their effects, and that it should also be free to them to sell their lands, houses, or effects, or to retain the property thereof, at their discretion; that such of them as should continue to reside within the said boundary lines should not be compelled to become citizens of the United States, or to take any oath of allegiance to the government thereof, but they should be at full liberty to do so, making and declaring their election within one year after the evacuation aforesaid. And all persons who should continue there after the expiration of the said year, without having declared their intention of remaining subjects of his Britannic Majesty, should be considered as having elected to become citizens of the United States.  The language of this article seems to be plain and its meaning evident; and we do not understand the parties to disagree at all concerning its construction. Its purpose was, to secure to the residents within that portion of the territory conceded to the United States by the treaty of peace, the same right to elect their allegiance which they would have had if possession had been surren-

-dered to the United States immediately on the conclusion -of peace. The election to become citizens of the United States, which would be evidenced by their remaining within the terriory for the time limited without declaring a differ--ent intent, made them citizens immediately, without any formality or ceremony whatsoever. As regards this territory, the revolution in government was not complete until such evacuation; and the right of election, which exists in all such cases (*Inglis v. Trustees of Sailor's Snug Harbor, 3 Pet., 122*), could not sooner have been exercised.

The parties do disagree, however, concerning the effect of this treaty, and the naturalization of John Harvey under the same, upon the alienage of Maria Yorke Harvey, the -daughter of John Harvey, begotten before he emigrated from England, and born in that country before the fourteenth day of April, 1802. The disputed question here, .arises under the fourth section of the act of Congress of the date last mentioned, which is as follows: "The children of persons duly naturalized under any of the laws of the United States, or who, previous to the passing of any law on that subject, by the government of the United States, may have become citizens of any one of the said states, under the laws thereof, being under the age of twenty-one years, at the time of their parents being so nauralized or admitted to the rights of citizenship, shall, if dwelling in the United States, be considered as citizens of the United States; and the children of persons who now are or have been citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens of the United States: *Provided,*" etc.

The section of the act of Congress which we have quoted is not so clear in its meaning as might be desirable, and there is some difficulty in satisfying ourselves precisely what classes were meant to be provided for by it. The diffi-

culty, however, does not arise under the first clause of the
section.    That clause takes up the case of persons "duly
naturalized under any of the laws of the United States," or
who, previous to the passing of any law on that subject by
the government of the United States, had become citizens
of any of the states under its laws, and makes their chil-
dren residing within the United States and under twenty--
one years of age at the time of the parents being so natu-
ralized or admitted to citizenship, citizens also.    Maria
Yorke Harvey did not become a citizen under this clause,
because she did not reside in this country, and never had,
up to the first day of June, 1797, when her father became
a citizen, if he ever did.    If her residence had been here,
I see no reason why she would not have been naturalized
under this law, if her father became a citizen under Jay's
treaty.    Of this there could be no question unless the
expression, "duly naturalized under any of the laws of the
United States," is to have a construction which shall con-
fine its operations to those who became citizens through
the forms of naturalization under an act of Congress.    But
a treaty is just as much a "law of the United States" as
an act of Congress (*Ware v. Hylton, 3 Dall., 199*); and there
is nothing in the language here used, or in the nature of
the case, which would lead to the inference that this pro-
vision of the act of 1802 was intended to apply to those
made citizens under statutory laws only.    On the other
hand, the language is not only broad enough to embrace
treaties, which by the constitution are declared to be,
equally with statutes, the law of the land, but there was
every reason why the naturalization of the head of the
family should embrace his minor children resident within
the country, in the one case just as much as in the other.
The purpose of the provision was broad and liberal, and it
should not have a narrow and limited construction, even if

its language would admit of it, which we do not think is the case.

The question remains, whether Maria Yorke Harvey became a citizen under the second clause of this fourth section of the act of 1802, assuming that her father became a citizen under Jay's treaty. That clause is, "the children of persons who now are, or have been, citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens of the United States." The proposition admits the citizenship of John Harvey at the passage of this act, and it is conceded that the daughter was born out of the limits and jurisdiction of the United States. Maria Yorke Harvey, it is therefore claimed, is within the terms of this provision. But does this clause embrace the case of children born abroad to alien parents, even though their parents became citizens subsequently? Attention to its terms will show, that it contains no restriction as to the age of the child, and none as to its residence within the country; so that, if it embraces the case of children born abroad to aliens subsequently naturalized, it may make citizens of those who were never domiciled in the country, and who, being of an age to act and judge for themselves, have never desired such citizenship. There is no reason whatever, for conferring this right upon such persons; the previous clause, which made the naturalization of the parents confer citizenship upon their children under age and residing in this country, was sufficiently liberal; but there was good reason why the accident of being born abroad, should not deprive the children of citizens, of the rights which would have been theirs had they been within the country. The first naturalization law —that of 1790—had provided for their case in these words: "And the children of citizens of the United States, that may be born beyond sea, or out of the limits of the United

States, shall be considered as natural born citizens." The corresponding provision in the act of 1795 was: "And the children of citizens of the United States, born out of the limits and jurisdiction of the United States, shall be considered as citizens of the United States." Neither of these provisions, it is evident, would embrace the case of children born to parents who only became citizens by naturalization subsequently. The clause in the act of 1802, now under consideration, appears to have had the same purpose as its predecessors; and to Chancellor Kent it "appears to have been intended for the case of natural born citizens, or of citizens who were original actors in our Revolution; and therefore it was more comprehensive and liberal in their favor" than the preceding clause, which made citizens, only of such children of naturalized persons as were under age and resident within the United States. He is also clearly of opinion that this second clause is not prospective in its operation (*2 Kent 53;* and see *Lawrence's Wheaton, App. 901*); and whether he is correct in this or not, I am satisfied it cannot be so construed as to make citizens of those whose parents at the time of their birth were aliens. In support of this view I refer to *Manchester v. Boston, 16 Mass., 235; Young v. Peck, 21 Wend., 390, 392; Peck v. Young, 26 Wend., 613, 624, 628.* And such would appear to be the construction subsequently placed upon this second clause, by Congress; for, in the act of February 10, 1855, passed apparently to give this provision prospective operation, it is declared that, "Persons heretofore born, or hereafter to be born, out of the limits and jurisdiction of the United States, whose fathers were or shall be *at the time of their birth,* citizens of the United States, shall be deemed and considered, and are hereby declared to be, citizens of the United States."—*10 Stat. at Large, 604.* The change here, is only such as was needful

to give it prospective operation, and I see no reason to suppose an intent existed to modify the law further.

Since, therefore, Maria Yorke Harvey was begotten before her father came to this country, and it is not claimed that he became a citizen before June 1, 1797, it is evident he must have been an alien at the time of her birth abroad, and consequently she did not become a citizen by virtue of this second clause of the fourth section of the act of 1802.

The instruction to the jury which the plaintiff requested upon this point, was as follows: "That clause in the act of Congress of April 14, 1802, which provides that the children of persons who then were or had been citizens of the United States, should, though born out of the limits and jurisdiction of the United States, be considered citizens of the United States, does not apply to the children of persons who became citizens under the provisions of the second article of Jay's treaty of 1794. If, therefore, John Harvey became a citizen under the aforesaid provisions of said treaty, Maria Yorke Harvey was not thereby made such citizen, though his daughter, and born out of the jurisdiction of the United States prior to April 14, 1802."

The instruction, if given in these terms, I think would have been incorrect. With great deference to the view expressed by Chancellor Kent, that this clause embraces only the cases of natural born citizens, and citizens who were original actors in the Revolution, I have been unable to discover any reason for supposing it was not meant to embrace the case of naturalized citizens also, nor does that eminent jurist suggest any. The term used is generic, embracing all citizens; and being employed without qualifying words, I cannot doubt that all citizens are included. The circuit judge, therefore, I think committed no error in refusing the instruction; though, had it been adapted to the

exact case then before the court, he should have granted it. For, as it was clear that John Harvey was not a citizen, either by birth or by participating in the revolution, or made such by naturalization previous to the birth of his daughter, her case, in my opinion, was neither within the words, nor within the intent, of this provision of the act of 1802.

The third principal question in the case arises upon the admission of a great amount of evidence put in by the defendants to show that, in the sale and conveyance of the land in controversy by the State Board of Escheats to the plaintiff, a fraud was committed upon the state.

If this were a proceeding on the part of the state to vacate the deed to the plaintiff on the ground of fraud in obtaining it, then all this evidence, or such of it as would have had any tendency to show fraud, would have been admissible. But the state raises no question of fraud, nor does it, so far as we are advised, dispute, on any ground, the validity of the plaintiff's deed; and the question of fraud is raised by parties who have no interest in it whatever. For it does not concern these defendants, whether the state asserts in its own name a right to these lands as escheated, or conveys its claim to another, who sues upon it; their defense is the same in either case; and the rule is general, that the adverse claimant is not permitted to raise a question of fraud in the conveyance to which he is a stranger. This is elementary law; and I should not deem it necessary to spend a moment's time upon it, if several cases had not been cited as justifying the ruling below, which admitted the evidence. But none of these cases is in point at all. In *Boardman v. Lessees of Reed and Ford, 6 Pet., 328,* and again in *Bagnell v. Broderick, 13 Pet., 436,* it is intimated that an equitable right derived under the United States, adverse to one of its patents, might be asserted in equity,

though constituting no defense at law. *Minter v. Crommelin, 18 How., 87,* holds that a patent by officers who had given it without authority of law, is void. In *Rice v. Railroad Company, 1 Black, 375,* it is said that, "if a patent is absolutely void upon its face, or the issuing thereof was without authority, or prohibited by statute, or the state had no title, it may be impeached collaterally in a court of law in an action of ejectment." The case of *Stoddard v. Chambers, 2 How., 285,* was one in which both parties claimed a legal title under the United States, and the defendant's patent was held to be void because the land embraced in it was not subject to be appropriated under the act under which it purported to be issued. Now, in the case before us, the defendants claim neither a legal nor an equitable right under the state, but their claim is an adverse one. They have insisted, however, that the state had no title; that the board of escheats had no authority to convey, and that the state deed was void upon its face. All these questions they have raised heretofore, and they have been considered by us; but the question of fraud is wholly distinct and separate from these, and none of the authorities justify its being raised here. On general principles, the party injured by a fraud alone can complain of it.

But it is urged on the part of the defense that the judgment should not be reversed for this error, because the findings of the jury show that the admission of the evidence caused the plaintiff no injury. The foundation for this argument is the response of the jury to the direct question: "Were said sale and conveyance [from the state to the plaintiff] fraudulent in fact?" To which they say, that they "cannot answer." In other words, the argument is, that the jury having failed to find on this evidence that a fraud had been committed, and decided the case on other

grounds, it thereby appears that this evidence did not affect the result.

Where it clearly appears that irrelevant testimony has worked no injury, the error in admitting it may be disregarded; but we ought to be able to see from the record, that such was the case.   It can seldom be held immaterial, I think, that a party was allowed to give evidence to affect the moral character of his antagonist, in a case where the character was not in any form in issue.   It is almost impossible that such evidence should be without influence upon the minds of the jury in prejudicing them against the party, if there is any thing in it whatever, which has a tendency to show him guilty of a moral wrong, even though it may fall short of producing conviction.   How can we say in this case, that this irrelevant testimony, put in to show that the plaintiff had connived at, and taken advantage of, a fraud, has not, insensibly, so far prejudiced the jury against the plaintiff, and aroused their sympathy for the defendants, as to have influenced their conclusions adversely to the plaintiff, on other branches of the case? Would even the express assertion of the jury, that they were not influenced by the testimony, be wholly conclusive, where, unless they were persons of very unusual poise and balance, and strength of character, some prejudicial influence would be inevitable?   But in this case the jury do not say they were uninfluenced.   The finding is unusual; it is not against fraud; it is that they cannot tell whether there *was* a fraud or not.   The evidence seems to leave them in doubt; they say neither guilty nor not guilty; the evidence has failed to convince, but it impresses them so far that they cannot acquit.   The verdict is one of "not proven," simply; and being expressed in this guarded manner, it carries upon its face the proof, that the testimony put in

upon this point had some influence upon the minds of the jury. It is no answer to say, that we must presume the jury to have been possessed of ordinary fairness and intelligence; that presumption we make in every case; but the law does not regard those qualities as a sufficient protection against their minds being influenced improperly by inadmissible evidence. If it did, it would indulge in a presumption wholly opposed to human experience.

I am, therefore, of opinion that all the evidence upon which the jury were required to return answers to the first ten questions put to them on behalf of the defendants, was wholly inadmissible; that its reception was erroneous in law, and that, as there is nothing in the record to show that it did not work an injury to the plaintiff, but the contrary is clearly to be inferred, the judgment should be reversed.

I do not think the court erred in admitting in evidence the tax-deed from the state to Reeder, bearing date June 4, 1851. The deed was evidence for what it was worth, and the facts upon which the plaintiff relied to defeat it, were no answer to its reception as testimony. They constituted matter of defense to the deed, but as they were facts which might possibly be disputed, the court could not assume them to be established, and shut out the deed on that ground.

The remaining question arises upon the responses of the jury to certain specific questions put to them by the court under the act of March 29, 1871. That act provides that, "No jury shall be compelled in any case to give a general verdict, so that they may not find a special verdict showing the facts respecting which the issue is joined, and therein require the judgment of the court upon such facts; and in all cases where an issue of fact is tried before any court of record, the court shall, at the request in writing of the

counsel of either party, instruct the jury, if they return a general verdict, also to find upon particular questions of fact to be stated in writing, and may direct a written finding thereon. The special verdict, or finding, shall be filed with the clerk, and entered upon the minutes; and when a special finding of fact shall be inconsistent with a general verdict, the former shall control the latter, and the court shall give judgment accordingly."—*Sess. L. 1871, Vol. 1, p. 66.*

In this case nineteen different questions were put to the jury at the request of the plaintiff, and eighteen on the request of the defendants; but they were instructed, at the instance of defendants, that they were not obliged to answer absolutely the questions submitted to them, and that if they were of opinion there was no evidence sufficient to satisfy their minds, in one way or the other, in regard to any particular question, they might so state in answer to any specific question.

Now this instruction, it seems to me, cannot be true at all, unless the particular question upon which the jury should fail to find, was irrelevant to the issue; and if it was, the court should not have allowed it to be put. No question should have been put to the jury which was not material to the inquiry upon which they were to enter; and upon every material question one party or the other would have held the affirmative, and unless he made out his case upon it by the evidence, should have had a *finding* against him upon it. Every fact essential to a party's case or defense which he fails to prove, is considered as not established, and must be negatived in the conclusions of the jury; it will not do to ignore it. The error in this instruction seems to have led the jury into other errors; for, in several cases in which they return a response which is equivalent to no finding whatever, they nevertheless

appear to make such futile answer the foundation for affirm-
ative conclusions.   Thus, though they say they cannot
tell whether John Harvey was ever naturalized as a citizen
of the United States, they proceed to answer, in response
to another question, that his daughter was "naturalized
through him."   Moreover, several of the questions to the
jury are so framed as to draw from them answers which
find no facts whatever; and yet these answers were evi-
dently treated by the jury as equivalent to an actual find-
ing.   Thus, the jury were asked, "Are you satisfied that
Maria Yorke Harvey died without heirs who were citi-
zens of the United States?"   Now the question which the
issue between the parties presented for their solution was,
whether she did die without such heirs; and unless the act
of 1871 introduces a practice which is entirely novel, a
question in this form, which required a positive finding
upon the fact, could alone have been proper.   Common-law
verdicts always find either the facts, or the legal conclusions
from facts; the jury say the party is guilty, or not guilty;
he owes, or he does not owe; he promised, or he did not
promise; to ask them if they are *satisfied* one way or the
other, is to suggest to their minds whether, notwithstand-
ing a *prima facie* case may have been made out, or a
defense *prima facie* established, there may not, after all, be
some possible doubt in the case; and it gives them an
opportunity, if they desire it, to avoid a direct decision.
Very few cases or defenses are so completely satisfying on
the evidence as to exclude all doubts; and the party who
can require the jury to say, whether they are *satisfied* with
his opponent's showing, may confidently rely upon a verdict
in most cases.   All that our practice requires in any civil
case is, that the party holding the affirmative should make
a *prima facie* showing; he thereby entitles himself to a
verdict unless that showing is disproved.   But in many

cases a *prima facie* case, though sufficient in law, is not very satisfying to the mind.    A tax-deed, for instance, makes a *prima facie* case in favor of the grantee, of the correctness of all the proceedings on which it was based; yet if eject-ment should be brought upon it, and the jury should be asked, "Are you satisfied that all the tax proceedings were regular?" conscientious men would be very likely to say, *No,* even though the showing counter to the deed, may have been wholly insufficient, and even though, had the question been put in proper form, they would have found in favor of the tax-title.    Besides, a question like this has a tendency to confound in the minds of the jury all the distinctions which exist as to the quality and amount of proof required in different cases,—distinctions well known in the law and founded in the highest reason.    It is one thing, to make out a case of debt, and a very different thing, to furnish the necessary proof to convict of murder; yet to make the evidence completely satisfying, the same strict proof might be required in the civil case as in the criminal.    The same fact requires more or different proof in some cases than in others; a marriage, for instance, demands strict proof in some suits, but is made out on very slight showing in others; and the jury would be instructed to find the fact in one case on the same evidence which they would be told was insufficient in another, though the effect in convincing the mind might be exactly the same in both cases.    On questions of pedigree, evidence is received and acted upon, which, in most other cases, is regarded as so untrustworthy as not to be received at all; and the jury are expected to receive it as sufficient for the case, notwith-standing its inconclusive character.    Obviously, the question, whether one left known legal heirs or not, when none appear who claim in that character, and none are found, is not one upon which the party can be required or expected

to make the same conclusive showing which is demanded in some other cases which admit of it; the jury are to find, not whether the evidence amounts to demonstration, but what the preponderance of proof is. Besides, in civil cases the burden of proof often changes from one party to the other; and upon this point, if the plaintiff made such a showing as to put the defendants to their proofs, the burden was then upon them to rebut it. Suppose they had taken up this burden and put in some evidence, and the court had then submitted to the jury the question, "Are you satisfied Maria Yorke Harvey did die leaving legal heirs?" is it not plain that, if the defendants' evidence was not entirely of a convincing character, they might have felt themselves compelled to respond in the negative, thus, in effect, finding against the defendants, even though the evidence might preponderate in their favor? It is plain, therefore, that such a form of question must necessarily be unfair to the side against whose showing it is directed; and that, of itself, is sufficient reason for rejecting it, even if it were admissible under the general course of common-law trials, which, as we have already seen, it is not.

It does not appear, however, that this form of question was objected to, and it would not therefore be necessary for us to remark upon it at all, but for the argument which is made on behalf of the defendants, that the verdict in their favor should be allowed to stand, notwithstanding errors may have been committed, because the findings actually made, and which are unaffected by the errors, are conclusive against the plaintiff. If some of the questions were such that the responses are actually in law no findings at all, it is evident we cannot make them the basis for any conclusion.

But if the questions were all proper, there would remain some of them not answered at all, though it was plainly

as much the duty of the jury to answer all as any part of them, and we cannot know that, if all had been answered, the general deduction from the facts found would have been the same.    To the extent that relevant questions properly put to the jury have been allowed to remain unanswered, there has been, I think, a mistrial.

It is further insisted, on behalf of the defendants, that the verdict should be suffered to stand notwithstanding any errors, because the state, by causing the lands to be assessed for taxation, and selling the same for delinquent taxes, waived its right to insist upon an escheat, and estopped itself from afterwards claiming the land.    The doctrine, that the state would waive its rights to its lands, or estop itself from claiming them, by taxing them to an occupier, and taking proceedings to enforce payment of the taxes, would be rather startling to the officers having charge of the public domain, and would indicate an easy mode in which trespassers might convert their trespass into a complete ownership.    If there were any thing inequitable in compelling a party, occupying and receiving the rents and profits of lands, to pay taxes upon them, the case would be different; but there is not.    On the other hand, our laws regarding the assessment and collection of taxes, have usually had regard to the possession rather than the ownership.    The township officer who makes the assessment goes to no record to inquire into the title; he assumes, and has a right to assume, that the occupant owes a duty to the government, in respect to his possession, and he taxes him accordingly; and all the subsequent proceedings by county and state officers are based upon this assessment, and with no more question usually, regarding the title, than was made by the assessor.    If the state sells for delinquent taxes, it warrants nothing and represents nothing; the purchaser takes the risk, not only of the original authority to

tax, but also of the regularity of all the proceedings. Now; to entitle a party to insist upon an estoppel, he must be able to show, that the other party has done something, or represented something, which has had the effect to deceive and mislead him, and which would render it inequitable for the right of such other party to be now enforced against him. If we inquire in this case, what the state has done which has misled or deceived Reeder, it will hardly be replied, that taxing the land to him could have that effect by making him suppose the land his own; for taxation does not imply ownership in the person taxed, and, if it did, we could not presume the party himself to be so ignorant of his rights as to be deceived by it. Nor can it be urged that the tax-deed to Reeder works an estoppel, for such a deed is always understood as giving no right but such as comes from the proceeding itself; the maxim is, *caveat emp-- tor.* The state, as before remarked, gives no warranty, holds out no promises, and makes no representations.

It, therefore, appearing, that there are errors in the record which are not obviated by the findings, the judgment must be reversed, with costs, and a new trial ordered.

The other Justices concurred.