TROWBRIDGE *v.* STATE HIGHWAY COMMISSIONER.

1. ESTOPPEL—ABANDONMENT OF RAILROAD RIGHT-OF-WAY.
    In ejectment to reclaim land which plaintiffs' parents had conveyed to a grantee for use for railroad purposes and which was to revert to grantors, their heirs or assigns upon cessation of such use, which land was eventually conveyed to board of county road commissioners and incorporated as a part of a superhighway, fact that, in deed to board, there was reserved a right of way for an electric railway would not be conclusive as to whether or not, under all the facts disclosed in suit brought about 10 years later, the possessors of the reversionary rights were chargeable with notice that the use of the land for a railway right-of-way had been abandoned.

2. SAME—RIGHT-OF-WAY FOR LIMITED PURPOSE—EVIDENCE.
    In ejectment to reclaim land conveyed by plaintiffs' parents for use solely for railway purposes and which had become a part of a public highway, in which action defendant highway commissioner interposed defense of estoppel, plaintiffs are chargeable with any facts or circumstances which tend to work an estoppel regardless of whether they occurred during the lives of plaintiffs' parents or subsequently thereto but prior to commencement of action of ejectment.

3. SAME—NOTICE OF ABANDONMENT OF LIMITED USE OF RIGHT-OF-WAY.
    In ejectment to reclaim land which had been conveyed by plaintiffs' parents to a grantee for use solely for railway right-of-way and which had subsequently become a part of land used in superhighway, wherein defense was interposed that plaintiffs were estopped from maintaining such action because of delay of 10 years before bringing it, plaintiffs may not claim that the construction of such superhighway was not notice of abandonment of use for railway purposes notwithstanding reservation of use for railway purposes in deed to highway commissioner, where it does not appear that the course of conduct of plaintiffs or their parents was influenced by such reservation.

4. SAME—NOTICE OF BREACH OF CONDITION—EVIDENCE.
    After conveyance of land by plaintiffs' parents to grantee for use solely for railway purposes, which land was later used

in the construction of a superhighway, record *held*, to show that plaintiffs and their parents were chargeable with notice and knowledge of the breach of the condition embodied in the parents' deed as of the time when the superhighway was first planned and being used by the public; hence, plaintiffs who began their action of ejectment about 10 years later were estopped from maintaining it.

5. EJECTMENT—ESTOPPEL—DEFENSE.
    Estoppel is a valid defense to an action in ejectment.

6. HIGHWAYS AND STREETS—DEFINITIONS—STATUTES.
    Statute defining highways as roads that shall have been used as such for 10 years or more, whether any record or other proof exists that they were ever established as highways or not, and all roads which have been or which may hereafter be laid out and not recorded, and which shall have been used eight years or more, is a statute of repose (1 Comp. Laws 1929, § 3936).

7. SAME—WIDTH OF HIGHWAY—USE OF LAND FOR PARKWAY.
    The acquisition of rights by the public under statute defining highways is not affected by the fact that the land within the highway boundaries is more or less than four rods in width; hence fact that most of strip of land in controversy was contained in parkway between paved portions of a super-highway more than four rods wide would not prevent strip from becoming a highway (1 Comp. Laws 1929, § 3936).

8. SAME—WIDTH OF USER.
    A highway by user becomes such to the width and extent used.

9. DEDICATION—HIGHWAYS.
    User of land as a highway for the statutory period conclusively establishes the dedication of the land for that purpose (1 Comp. Laws 1929, § 3936).

10. HIGHWAYS—USER FOR 10 YEARS.
    Roads used as highways established in pursuance of existing laws for 10 years or more are deemed public highways whether any record or other proof exists that they were ever established as highways or not.

11. SAME—NOTICE TO OWNER OF DENIAL OF TITLE.
    The use required by the statute to make a way a public highway is one accompanied by some act on the part of the public authorities, open, notorious, and hostile to the private ownership, which gives the original owner notice that his title is denied (1 Comp. Laws 1929, § 3936).

Appeal from Wayne; Moynihan (Joseph A.), J. Submitted January 17, 1941. (Docket No. 16, Calendar No. 40,928.)   Decided March 11, 1941.

Ejectment by Russell A. Trowbridge, individually, as executor of the estate of Oliver A. Trowbridge, and as administrator of the estate of Grace Trowbridge; and Elmer J. Trowbridge, against Murray D. Van Wagoner, State Highway Commissioner. Judgment for defendant. Affirmed.

*Jesse Bollinger* and *Walter S. Rae,* for plaintiffs.

*Herbert J. Rushton,* Attorney General, and *Edmund E. Shepherd,* Solicitor General, for defendant.

North, J.  This is an action in ejectment. Upon hearing in the circuit court without a jury, judgment was entered for defendant. Plaintiffs have appealed. There is no material conflict in the facts essential to decision. Russell A. Trowbridge and Elmer J. Trowbridge are sole heirs of Oliver A. Trowbridge and Grace Trowbridge, both deceased prior to suit. On March 5, 1912, Oliver Trowbridge and his wife Grace Trowbridge were the owners in fee of certain farm land located in section 20 of Dearborn township, Wayne county, Michigan. The record is not too clear, but title seems to have been in Mr. Trowbridge's name. This land was bounded on the south for a distance of nearly 80 rods by a highway known as Michigan avenue or the Chicago road. On the date above noted Mr. and Mrs. Oliver Trowbridge by warranty deed conveyed to F. W. Brooks, as trustee for the Detroit, Ypsilanti, Ann Arbor & Jackson Railway, the following described portion of their farm lands:

"A strip of land lying north of and adjacent to the highway known as Michigan avenue or Chicago

road and extending across the entire front of lands of said first parties, in section 20 of said township, * * * said strip of land being 33 feet in width from the west end of said parcel to a point 75 feet east of first parties' house as now located, thence widening with a straight line boundary on the north to a width of 66 feet at the east line of said parcel.''

The deed contained the following:

''Said strip of land shall be used for railway purposes only and ceasing to be used for such purposes shall revert to the said first parties, their heirs or assigns.''

Subsequently the grantors in the above deed conveyed the remainder of their farm to one Philip Zabger, but in this latter deed the strip of land theretofore conveyed to Brooks was specifically excepted. The strip of land conveyed to Brooks was never used for railway purposes, at least it is so alleged on information and belief in defendant's answer, and is not denied by plaintiffs. And further, the only testimony as to there being an electric railroad in this locality discloses that it was constructed some time prior to 1912, and evidently it was within the highway limits and not upon the property here in suit. The tracks of this electric railway were removed so long before this suit was instituted that Russell Trowbridge testified he could not tell whether it was before or after the north slab of Michigan avenue was constructed in 1925; although he remembered ''of the tracks being taken up.'' As disclosing further the factual aspect of the case, we quote from appellants' brief:

''The successors in title to F. W. Brooks, trustee, the Detroit, Ypsilanti, Ann Arbor & Jackson Railway on March 31, 1925, conveyed the land in question to the board of county road commissioners of Wayne

county reserving in said conveyance the right of the
railway company to operate electric railway over
said land.

"The board of Wayne county road commissioners
at that time (1925) proceeded to include the land in
question in its superhighway plan and proceeded in
the actual construction of a concrete superhighway
having two lanes for traffic with a parkway be-
tween; the land in question in this proceeding being
practically all within the parkway area, only a small
portion thereof being covered with concrete on the
westerly [easterly] end of the westbound traffic
lane.

"The construction of the highway was completed
and officially accepted by the proper authorities on
December 31, 1926, although actually opened to traf-
fic prior to that date.

"On November 2, 1929, pursuant to foreclosure
proceedings in chancery, the land in question was
conveyed by special master's deed to the Union
Trust Company of Detroit, Michigan, who on Au-
gust 27, 1930, by their successor the Union Guardian
Trust Company, conveyed the land in question to
Grover C. Dillman, State highway commissioner,
predecessor in office to the defendant in this case,
Murray D. Van Wagoner."

It thus appears that in 1925 the right of way had
been acquired and the actual construction commenced
for the widening of Michigan avenue in the location
in question. As improved its total width was approx-
imately 204 feet and the purpose was to construct a
so-called superhighway. This was accomplished by
securing from the successors in title to the Trow-
bridge farm another strip of land substantially 66
feet in width lying adjacent to and next north of the
strip theretofore conveyed to Brooks. A paved way
for eastbound traffic was constructed on the southerly
side of Michigan avenue and one for westbound

traffic on the northerly side, where the property was acquired for widening. Between these two pavements center parkways were laid out. The strip of land which in 1912 was deeded to Brooks is included within the parkway, with the exception of a very small portion on the northerly side to the extreme east end, over which portion the pavement was laid and the shoulder of the road extended out from this pavement.

The theory upon which plaintiffs assert a right of recovery is that in consequence of a breach of the condition embodied in the Brooks deed and the death of their parents prior to suit, plaintiffs became possessed through inheritance of the fee title to the strip of land described in the Brooks deed. It is their claim that a breach of the condition embodied in the deed occurred when title to the parcel on foreclosure sale passed to the Union Trust Company, November 2, 1929, or at least when the grantee in that deed through its successor, the Union Guardian Trust Company, on August 27, 1930, quitclaimed to Grover C. Dillman as State highway commissioner of Michigan.

The importance of fixing the date of the breach of the condition in the Brooks contract at the dates just above noted, rather than the earlier period of 1925 during which the highway was laid out and being constructed, is that plaintiffs claim that the defense of estoppel would not be tenable under the established law of this jurisdiction if the breach did not occur until 1929 or 1930. In this particular plaintiffs rely on cases in accord with *Shean* v. *United States Fidelity & Guaranty Co.*, 263 Mich. 535, 541, wherein we said:

"To entitle a party to insist upon an estoppel, he must show that the other party has done something,

or represented something, which has had the effect of deceiving and misleading him, and which would render it inequitable to enforce against him the alleged right of such other party.  *Crane* v. *Reeder,* 25 Mich. 303.''

The position of defendant is stated in his brief as follows:

''Although plaintiffs should have known that the strip of land conveyed for railway purposes only had long been abandoned for such use—and had never been used by the grantee—they failed to assert their rights, and, in an action of ejectment, are estopped from reclaiming possession of such land which, for upwards of 10 years, has occupied the center of a through State trunk line highway.

''Plaintiffs are also confronted by an irrebuttable statutory presumption that the strip of land in question had lawfully become part of the highway, Act No. 283, chap. 1, § 20, Pub. Acts 1909 (1 Comp. Laws 1929, § 3936 [Stat. Ann. § 9.21]).''

In passing upon the defense of estoppel it is therefore of prime importance to determine from this record at what time there first occurred such a breach of the condition embodied in the Brooks deed as would result in plaintiffs being chargeable with notice thereof.  In plaintiffs' brief, hereinbefore quoted, they state that in 1925 the board of Wayne county road commissioners ''proceeded to include the land in question in its superhighway plan and proceeded in the actual construction of a concrete superhighway having two lanes for traffic with a parkway between; the land in question in this proceeding being practically all within the parkway area.''

In connection with the above it should be noted again that in the conveyance under which the Wayne

county board of road commissioners took title to the strip in suit there was reserved the right of the railway company to operate the electric railway over said land. However, we do not think this circumstance is conclusive as to whether or not under all the facts disclosed the party or parties who at that time possessed the reversionary rights in this strip were chargeable with notice that its use for a railway right-of-way had been abandoned.

Plaintiffs' father, grantor in the Brooks deed, died in 1936, and his wife died about a year and a half later. While plaintiffs herein did not become possessed of their alleged reversionary rights until the death of their parents, still plaintiffs are chargeable with any facts or circumstances which tend to work an estoppel regardless of whether such facts and circumstances occurred during the lives of plaintiffs' parents or subsequently thereto, but prior to the time this suit was instituted, March 25, 1938. When plaintiffs' parents disposed of their farm they became residents of the village of Dearborn in Dearborn township. Later plaintiffs' parents went to live west of Dearborn on Cherry Hill road, about 2 miles from Russell's home; and still later they lived in the home of their son Russell and remained there until they died. Russell lived about 7½ miles northeast of Ypsilanti and at the time of the hearing in the circuit court had resided there continuously for approximately 19 years. Plaintiff, Elmer J. Trowbridge, had resided in Dearborn for upwards of 30 years at the time of the hearing. While these respective places of residence are not in the immediate neighborhood of the land in suit, still they are by no means remote therefrom; and it certainly taxes credulity to indulge in the thought that plaintiffs or their father did not know of the development of Michigan avenue as a superhighway all along the

route in the locality of the farm formerly owned by Oliver A. Trowbridge. It was an undertaking of such character that the public was well advised of its nature. While Russell Trowbridge testified that he seldom went to Detroit, when he did make such trips he went by way of Dearborn; and he further testified that he imagined his brother Elmer, who was not a witness, went from Dearborn to Detroit occasionally. In any event Elmer had lived continuously in Dearborn for over 30 years. As bearing upon his knowledge we quote from the testimony of plaintiff, Russell Trowbridge:

"*Q.* Back at the time they were building the road or highway at Michigan avenue, you knew of that, didn't you?

"*A.* Oh yes. * * *

"*Q.* But you remember of both slabs having been built?

"*A.* Yes, sir. * * *

"*Q.* Do you know for certain whether that slab was built on any part of your property or not?

"*A.* I couldn't say that as far as that goes, I couldn't really say the parkway on that or whether the slab on it, I couldn't say that because I am not—

"*Q.* When this [north] slab was being built you didn't know whether it covered your property or not?

"*A.* I couldn't say that, no, I do not, I just saw it being built as I went back and forth through there, that is all. * * *

"*Q.* Well * * * you remember of the tracks being taken up on the right of way, do you not?

"*A.* Yes, sir. * * *

"*Q.* Do you remember when those tracks were removed?

"*A.* I don't remember, I could not say.

"*Q.* Do you know whether they were removed before they started to widen Michigan avenue before

that north slab was built, before the first slab was built out there in connection with the widening?

"*A.*   *   *   *   I just don't remember that."

The construction work on the superhighway was accepted as completed December 31, 1926, and it was open to travel prior to that date. From the time Michigan avenue was being developed into a superhighway, it evidently has been bounded by lines on its north and south sides with an intervening space of approximately 204 feet. Midway between these boundaries there has been the center parkway which is common in such highways. That the parkway was a part of the highway and used as such was indicated by the fact in the portion in front of the Trowbridge farm there were two so-called crossovers by which provision was made for highway traffic to pass from the westbound lane to the eastbound lane or vice versa. The undisputed testimony in this record is that the parkway was taken and held "for future expansion as traffic needs demanded." Further, the parkway has been continuously maintained by the highway department. The whole situation was such as to indicate plainly that the intent to construct and operate an electric railway along this thoroughfare had been abandoned; and this was obvious from the time the superhighway was first developed in 1925. During all the years intervening between 1925 and the commencement of this suit in 1938 this center parkway has constituted a part of the highway construction and maintenance which, as a safety element, has effectively separated the eastbound and westbound traffic, and this center strip has also been maintained and served for ornamentation. It was as much a part of the highway as though it had been covered by the pavement. And further, beyond the bounds of the Trowbridge farm the construction

of this superhighway is of like character; and this surely has its bearing upon the question of notice to all concerned of the evident use the public intended to make of the land in suit at the time the highway was laid out and being constructed.

It cannot be said in behalf of plaintiffs that the development, construction and maintenance of this superhighway by the Wayne county road commission was not notice of abandonment of the railway right-of-way, since such railway right-of-way was reserved in the deed to the Wayne county road commission. There is no testimony that prior to this suit either plaintiffs or their father had any knowledge of such reservation; and therefore it does not appear their course of conduct was influenced thereby. As bearing upon estoppel, it is worthy of note that the knowledge possessed by plaintiffs' father at the time this superhighway was planned and being constructed was difficult if not impossible of proof at the time this belated suit was brought, his death having occurred in the meantime. During all the rather extended period when construction of this superhighway was in progress, and which obviously involved the expenditure of large sums of public money, no claim of private rights in the strip in suit was made so far as disclosed by the record. Instead, plaintiff's father and subsequently plaintiffs remained wholly inactive and failed to assert any claim until just immediately prior to instituting this suit. We think this record is such that the plaintiffs and their father, when living, were chargeable with notice and knowledge of the breach of the condition embodied in the Brooks deed as of the time when this superhighway was first planned and being constructed and used as such by the public, about 1925; and in consequence thereof plaintiffs are estopped from obtaining relief in this suit.

It is thoroughly settled in this jurisdiction that estoppel is a valid defense to an action in ejectment. *Sliwinski* v. *Gootstein,* 234 Mich. 74; *Weber* v. *Ford Motor Co.,* 245 Mich. 213. As we view this record, decision herein is controlled by our recent holdings in *Kipp* v. *State Highway Commissioner,* 286 Mich. 202; *Green* v. *Railroad Co.,* 287 Mich. 29.

We are also of the opinion that defendant is correct in asserting that because of provisions in the Michigan highway law, the strip of land in suit must be held to be a part of the highway. The statute is one of repose. *Campau* v. *City of Detroit,* 104 Mich. 560. The pertinent portion reads:

"All highways regularly established in pursuance of existing laws, all roads that shall have been used as such for ten years or more, whether any record or other proof exists that they were ever established as highways or not, and all roads which have been or which may hereafter be laid out and not recorded, and which shall have been used eight years or more, shall be deemed public highways, subject to be altered or discontinued according to the provisions of this act. All highways that are or that may become such by time and use, shall be four rods in width, and where they are situated on section or quarter section lines, such lines shall be the center of such roads, and the land belonging to such roads shall be two rods in width on each side of such lines."

Plaintiffs assert that the quoted statute is not applicable because this is not a highway confined to a width of *four* rods, but instead the strip in suit lies between two paved ways, one for eastbound traffic and the other for westbound traffic, and except for a small triangular parcel, the land claimed by plaintiffs has not been used as a portion of the paved or actually traveled portion of the highway, and excepting also the two crossovers above noted. We

think plaintiffs' contention in this respect is not tenable but instead is too narrow. Acquiring highway rights under the statute is not affected by the fact that the land within the highway boundaries may be of a width less than four rods or more than four rods.

"It is not necessary that a highway established by user should be of the statutory width of four rods. A highway by user becomes such to the width and extent used." *Wayne County Savings Bank* v. *Stockwell,* 84 Mich. 586, 590 (22 Am. St. Rep. 708).

Holding, as we do, that the parkway of this superhighway has been part and parcel thereof since the date of the original widening renders the quoted statute and the following authorities applicable and controlling of the instant case.

"User of land as a highway for the statutory period conclusively establishes the dedication of the land for that purpose." *Campau* v. *City of Detroit* (syllabus), *supra.*

"Roads used as highways established in pursuance of existing laws for 10 years or more are deemed public highways whether any record or other proof exists that they were ever established as highways or not." *Olsen* v. *Village of Grand Beach* (syllabus), 282 Mich. 364.

"In view of the well-known rule that actual notice to the owner is not required, if the user is such that he ought to have known of it, the court was in error in directing a verdict for defendant [based upon a holding against the establishment of a public way by user]." *Village of Manchester* v. *Clarkson* (syllabus), 195 Mich. 354.

"The use required by the statute to make a way a public highway is one accompanied by some act on the part of the township [public] authorities, open,

notorious, and hostile to the private ownership, which gives the original owner notice that his title is denied.'' *Murphey* v. *Township of Lee* (syllabus), 239 Mich. 551.

''We do not think that actual knowledge of the adverse holding is required when the circumstances are such that the contiguous holder ought to have known it.'' *Bird* v. *Stark,* 66 Mich. 654.

The judgment entered in the circuit court is affirmed, with costs to appellee.

SHARPE, C. J., and BUSHNELL, BOYLES, CHANDLER, MCALLISTER, WIEST, and BUTZEL, JJ., concurred.